UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MARISSA COTTON

      Plaintiff,                      Case No.

vs                                   Honorable Judge:

ADRIAN COLLEGE, ADRIAN COLLEGE     Magistrate Judge:
PRESIDENT and BOARD OF
TRUSTEES, KATHY MORRIS,
in her official and individual capacity, and
KATHERINE CRAWFORD, in her
individual capacity

           Jointly and Severally,

           Defendants.
_____/
RODNEY WILLIAMS (P47888)
Attorney for Plaintiff
615 Griswold Street; Suite 700
Detroit, Michigan 48226
(313) 309-7852
(313) 309-7853 (Fax)
AttorneyRodneyWilliams@gmail.com

## CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

     NOW COMES Plaintiff, Marissa Cotton ("Ms. Cotton"), by and through her

attorney, Rodney Williams,  and for her Complaint against Adrian College

("Adrian"),  Adrian College President and Board of Trustees ("Board of

1

Trustees"), Kathy Morris ("Coach Morris") and Katherine Crawford ("Ms.

Crawford) collectively referred to as "Defendants," states as follows:

## **PARTIES**

1.   Ms. Cotton, a Black female, is a natural person, citizen of the United

States, and resident of the State of Michigan. During the events described herein,

Plaintiff was a student at Adrian and a member of the Women's Basketball Team.

2.   Defendant Adrian was founded in 1859 and is a private liberal arts

educational institution based in Adrian, Michigan accredited by the Higher

Learning Commission organized and existing under the laws of the State of

Michigan.

3.    Upon information and belief,  Defendants Board of Trustees are the

body corporate and governs Adrian. They also advise and are responsible for

policy making and supervisory functions of the Adrian administration, as provide

by state law.

4.    Defendant Kathy Morris, a white female and at all relevant times to the

Complaint was employed by Adrian as the Women's Basketball Head Coach and a

resident of Adrian, Michigan.

5.   Defendant Katherine Crawford, a white female and at all relevant times

to Complaint was a student at Adrian and a member of the Women's Basketball

Team.

## JURISDICTION AND VENUE

6.    This Court has federal question and supplemental jurisdiction pursuant

to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: (i) the federal law claims

arise under the constitution and statutes of the United States; and (ii)  the state law

claims are so closely related to the federal law claims as to form the same case or

controversy under Article III of the U.S. Constitution.

7.   This Court has original subject matter jurisdiction under 28 U.S.C. §

1343 because this is a civil action authorized by law brought by a person to redress

the deprivation, under color of a State Law, statute, ordinance, regulation, custom

or usage, of a right, privilege or immunity secured by the Constitution of the

United States or by an Act of Congress providing for equal rights of citizens or of

all persons within the jurisdiction of the United States, and a civil action to recover

damages or to secure equitable relief under an Act of Congress providing for the

protection civil rights.

8.   That this lawsuit involves conduct by the Defendants, which violates

Title VI of the Civil Rights Act of 1964, 42 U.S.C §§ 2000d through 2000d-6, and

the Fourteenth Amendment of the United States Constitution.

9.   That Adrian receives federal financial assistance and is therefore, among

other reasons, subject Title VI, 42 U.S.C. § 2000d et seq., which prohibits

discrimination on the basis of race, color, and national origin in programs and

activities receiving federal financial assistance.

10. This Court has personal jurisdiction over Defendant Adrian on the grounds that the College is conducting business within the State of Michigan.

11. This Court has personal jurisdiction over Defendant President and Board of Trustee on the grounds that it is conducting business within the State of Michigan and is the governing body of Adrian.

12. This Court has personal jurisdiction over Defendant Coach Morris on the grounds that she was employed by Adrian as its Women's Basketball Head Coach at all relevant times herein.

13.     The claims are cognizable under the United States Constitution, 42 U.S.C. § 1983, 20 U.S.C. § 1681 et seq., and under Michigan Law.

14.     The amount in controversy exceeds the jurisdictional minimum of $75,000.00,  exclusive of costs and interest.

15.     Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2), because the acts and events giving rise to the claims occurred in Lenawee  County, Michigan which sits in the Southern Division of the U.S. Eastern District of Michigan.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

16.  Prior to matriculating at Adrian, Ms. Cotton attended Harrison High School in Farmington Hills, Michigan graduating in 2013. As one of the top Black student-athletes in the district, she earned four letters each in

basketball and volleyball. Her basketball squad won districts and advanced to regional finals as a senior with a 23-2 record. Also as a senior, Ms. Cotton helped her high school win the Oakland Activities Association (OAA) Conference title for the first time since 1998. She was named third-team All-Oakland County as a senior and first-team All-Oakland Activities Association Division. Finally, she was a member of school's Honor Roll and received the Student-Athlete Honor Certificate Award.

17.    That as a result of Ms. Cotton accomplishments, she was heavily recruited by college women's basketball programs.

18.   Adrian athletic teams, nicknamed the "Bulldogs," are part of the Michigan Intercollegiate Athletic Association (MIAA) and the National Collegiate Athletic Association Division III.

19.    After meticulous review of all her offers, Ms. Cotton selected Adrian to start her college student-athlete journey because of Adrian's great academic programs and "home feeling" during her campus visit. Also her athletic goal was to help the Bulldogs win a championship.

20.    That upon her arrival to Adrian, Ms. Cotton made immediate contributions to its women's basketball program on the court by making varsity in her first year and in the community by donating food and clothes to those in need.

21.   On the court in her first year, Ms. Cotton's played in twenty-five games, averaging 12.1 minutes…shot 41.4 percent (41-of-99) from the floor…averaged 2.1 rebounds…scored 124 points and averaged 5.0 points per game…ranked number seven in the MIAA for highest 3-point percentage (36.5) and eighth for most 3-point shots made (19-of-52).

22.   That every year, Ms. Cotton set personal basketball records in virtually every statistical category.

23.   Off the court, Ms. Cotton was just as impressive. She was active in the community volunteering at the YMCA Kid's Field Day and Adrian College Halloween Safety Patrol. Ms. Cotton also used leftover "swipes" on her meal plan to buy food for friends or teammates. In her third year, she made local and national news by using leftover "swipes" on her meal plan to start helping people around the community who were in need. Ms. Cotton worked with cafeteria workers to use her remaining sixty swipes to make more than forty meals to donate to the Salvation Army. She's hoped the pay-it-forward act would catch on, and it did as other students on campus started doing the same. As a result of all her community activities, the Mayor of Adrian officially recognized Ms. Cotton.

24.   As a result of her leadership on and off the court, at the beginning of the 2017 season Ms. Cotton received special honor when she was selected

as one of the team's captains. Team captain was quite the honor as it is only given to those athletes whom the rest of the team respect and trust to lead the team in the right direction.

25.    That during the first four games of the 2017 season Ms. Cotton earned the co-captain and team leader designation by becoming  Adrian's top scorer and leading the team in assists and three points. These accomplishments received high praise from teammates, coaching staff, and the media.

26.    That in further acknowledgement of her high performance during her entire career at Adrian College, professional women basketball teams scouted Ms. Cotton and the media highlighted her potential future.

27.    Ms. Cotton's  stellar career was flawless until on or about  December 6, 2016, when Coach Morris removed her from the basketball team.

28.    That at no point during Ms. Cotton's conversation with Coach Morris did she provide her with a rationale for the removal.

29.    As a result, Ms. Cotton's was devastated and the expectation of completing her final year on Adrian's Women Basketball Team shattered.

30.    That this unprovoked and abrupt action shocked not only Ms. Cotton and her family but also the entire Adrian Women's Basketball community (teammates, alumni, media, and fans).

31.    That after an uproar by teammates, Coach Morris "coded" comment to the basketball community was that "the team was moving in a different direction."

32.   That the previous year, Coach Morris recruited her own daughter to play at Adrian.

33.    That Coach Morris frustrated with the backlash of her decision, threatened Ms. Cotton's teammates to remain silent or face the same consequences.

34.    That at the time of her removal, Ms. Cotton was the only Black senior and co-captain on the team.

35.   That no other seniors (4 white teammates) or co-captains (4 white co-captains) were removed.

36.    That Coach Morris action singled out Ms. Cotton and treated her differently than her white teammates not in her protected class.

37.    That Ms. Cotton never had any academic violations and maintained a 3.2 grade point average.

38.    That throughout Ms. Cotton's basketball career she was the model college student-athlete and never previously benched, suspended, or disciplined.

39.    Unsatisfied with Coach Morris reason for her removal, Ms. Cotton requested that Adrian Athletic Director, Mike Duffy conduct an independent investigation.

40.  Mr. Duffy initially agreed to an investigation and to clarify the rationale for removal with Coach Morris.

41.    No investigation was conducted and when Ms. Cotton requested a status update, Mr. Duffy became non-responsive except to tell Ms. Cotton that Coach Morris no longer wanted her on the team.

42.    Disappointed with Mr. Duffy's verbal response, Ms. Cotton contacted Frank Hribar, Vice President at Adrian to again request an investigation at his level.

43.    That during the meeting with Ms. Cotton and her parents,  Mr. Hribar agreed that an investigation should have been performed prior to any removal and that such action by Coach Morris appeared unfair. In fact, Mr. Hribar indicated that he recalled a similar situation wherein a white female hockey player was removed without an investigation and was immediately reinstated.

44.    That Mr. Hribar further communicated that since Ms. Cotton was a stellar senior and dedicated her entire collegiate experience to the varsity basketball team, she should receive the same treatment as the white female hockey player.

45.    That after talking to Mr. Hribar, Ms. Cotton was confident this matter would be timely resolved.

46.    Concerned after weeks of no movement in her quest for reinstatement, Ms. Cotton  sent a letter to the College President, Jeffrey Docking, seeking final resolution. Unfortunately, President Docking never responded to Ms. Cotton or her parents request for a meeting or reinstatement.

47.    That after exhausting all her attempts to resolve this injustice within the Adrian system, Ms. Cotton reluctantly filed a complaint with U.S. Department of Education Office of Civil Right (OCR) on January 5, 2017. Ms. Cotton's alleged that Adrian removed her from the women's basketball team based on her race.

48.    That on or about January 9, 2017, Adrian and Board of Trustees were notified of her complaint.

49.     That an alum attended a game after Ms. Cotton's removal and inquired why Ms. Cotton was no longer on the team. Coach Morris younger daughter quickly informed her that "[w]ell, I heard there was something about a lawsuit, but I can't say much about that."

50.    That it is the belief of Ms. Cotton that Coach Morris was either involved or initiated false rumors designed to intentionally interfere with

Ms. Cotton ongoing relationship with her previous teammates and cover her discriminatory act.

51.    Nonetheless, Ms. Cotton and her previous teammates continued to communicate in hopes that she would reunite with the team before the end of the 2017 season.

52.    That after five weeks of filing her compliant with OCR, shockingly Ms. Cotton received a call from Adrian campus safety informing her to come by and pick up court ordered papers regarding a Personal Protection Order (PPO) filed against her and a Notice of No-Contact (See Exhibit 1) issued by Adrian.

53.    That the allegations in the PPO and apparently the basis for the Notice of No-Contact were as follows:

a.  Ms. Crawford, a former team mate, alleged that  on November 17, 2016, she shared a team group chat photo that she thought was funny, and that Ms. Cotton jokingly shared a team photo of Ms. Crawford back to the group. None of the fun filled pictures shared by Ms. Cotton or Ms. Crawford had any semblance of maliciousness and in no way, as suggested by Ms. Crawford,  did Ms. Cotton make other players text comments about Ms. Crawford,

b.  That Ms. Crawford alleged on October 21, 2016, while waiting in the shared area to pick up two of Ms. Cotton's roommates, that Ms. Cotton asked for ride but informed Ms. Crawford that she  needed to hide her valuables first. At

which time, Ms. Crawford alleges that Ms. Cotton asked her to close her eyes and when she did not do so, Ms. Cotton made one of her roommates stand in front to block Ms. Crawford's view. However, Ms. Cotton had a lock on her room door so she never need to hide anything inside her room. It was Ms. Cotton's friend and roommate who was putting her laptop away not Ms. Cotton.

    c.    That Ms. Crawford alleged on October 18, 2016, that Ms. Cotton told her she was not good at basketball because she falls a lot and that she left the locker room crying. Ashley Morris, the head coach's daughter, alleged that Ms. Cotton kept talking about Ms. Crawford saying that she is childish and a crybaby. This is simply not true. Ms. Cotton and most of the players were genuinely concerned with the health of Ms. Crawford since her falls happen without contact. The allegation that Ms. Cotton's inquiry resulted in Ms. Crawford becoming upset is unfounded because Ms. Crawford indicated  that she was having personal problems at home before running out of the locker room.

    54.    That without any investigation or inquiry on whether the allegations were true or if they even met the requirement for a Notice of No-Contact, the Defendants arbitrarily issued it.

    55.  That Adrian's issuance of the Notice of No-Contact without any semblance of following its internal policies amounted to blatant racism, and

the belief that a white student allegation against a Black teammate is inherently more credible on its face based on the old Jim Crow theology.

56.  That fortunately, the OCR investigation report dated  September 9, 2021 (which will be discussed later) uncovered that Adrian and Coach Morris blatantly tried to cover up the fact that internal disciplinary policies where never followed and thus violating Ms. Cotton's due process rights.

57.  That the Defendants deliberate indifference and total disregard of fairness by intentionally not following its policies and procedures caused  Ms. Cotton great harm to include mental and psychological anguish, loss of reputation, embarrassment, humiliation, and loss of future earnings.

58.  That what was another obvious and glaring red flag related to the Notice of No-Contact was it was devised  and issued to Ms. Cotton  February 15, 2017, well after she filed her OCR complaint.

59.  This is critical because the Notice of No-Contact document showed that Ms. Cotton must cease her continued contact with Ms. Crawford as  it was unwanted, threatening and intimidating. Moreover, it attached severe consequences if she should violate the Notice. However, Ms. Cotton had not seen or communicated with Ms. Crawford since December 6, 2016, the day Ms. Cotton was removed from the team. Thus, for what purpose then was it written?

60.   That as it relates to the PPO,  on February 23, 2017, Ms. Cotton along with her attorney appeared in the 37th Circuit Court to address the allegations. Prior to the hearing, the Defendants tried to discourage Ms. Cotton's teammates and roommates from appearing as witnesses. They appeared on her behalf and defense, nonetheless. At the hearing Honorable Judge Margaret Noe said that the complaint filed had been previously denied by another Judge and was surprised it was still pending. Ms. Cotton had no knowledge of the prior case. As a result, Ms. Cotton's witnesses were not needed as the Court summarily denied the frivolous PPO due to insufficient evidence.

61.   That after leaving the court, Ms. Cotton along with her father immediately proceeded to the Adrian Campus Safety Administration, spoke with Chief Wade, and presented him with Circuit Court dismissal.

62.   That Chief Wade indicated that since the PPO was denied he agreed that the sanctions should be removed but needed approval from the Adrian Dean of Student Affairs, Troy Schmidli.

63.   That Ms. Cotton father went ahead to Mr. Schmidli office to discuss  removal of Ms. Cotton's sanctions based on the dismissal of the PPO.

64.   However, Mr. Schmidli refused to this date to remove any negative records/communication in Ms. Cotton's student files even having knowledge of the Court's decision.

65.   What is quite confusing and Judge Noe touched on it during the Circuit Court hearing, why was the PPO that was earlier summarily rejected resubmitted? It is the belief of Ms. Cotton that the Defendants in concert with Ms. Crawford tried to use both the PPO and Notice of No-Contact to discredit Ms. Cotton allegations she submitted to OCR.

66.   That at the time of the PPO and Notice of No-Contact, Ms. Crawford was a member of the women's basketball team, that she and Coach Morris daughter were best friends, that as a result she and Coach Morris had a personal relationship, that Ms. Crawford had knowledge of the OCR complaint or false rumor that Ms. Cotton had filed a lawsuit, that prior to filing the PPO Ms. Crawford reached out to Ms. Cotton on two occasions:  First, on October 23, 2016, Ms. Cotton received a text from Ms. Crawford stating that if she  wanted to use Ms. Crawford's discount at Dunham to say that she was her step sister and what her code was. Second, on November 23, 2016, Ms. Cotton rode with a roommate to practice, and because it was the last practice before Thanksgiving she left quickly for a flight that she had to catch. As a result, Ms. Cotton asked Ms. Crawford for a ride home, to which she agreed. If Ms. Crawford's PPO and the

basis for the Notice of No-Contact were decided in October prior to these encounters, clearly Ms. Crawford's allegations of feeling threatened, intimidated, and wanted no contact with Ms. Cotton cannot be credible.

67.  Ms. Crawford and the Defendants had to know that the PPO previously dismissed  would have negated the issuance of the Notice of No-Contact in February 2017.

68.  That it should be noted that Ms. Crawford graduated from Adrian in 2017 and soon Coach Morris selected her as the Assistant Women's Basketball Coach.

69.  That this was and still is an intentional act in retaliation against Ms. Cotton for filing her original OCR complaint.

70.   That as a result, Ms. Cotton then filed a second complaint against Adrian with OCR on February 20, 2017, alleging that Adrian retaliated against her for filing her original January 5, 2017, complaint by issuing a Notice of No- Contact sanction letter that threatened to suspend or expel her from school.

71.  That the Defendants actions should shock the conscience of the Court and the Adrian college community.

72.   That since filing the two OCR complaints in 2017, Ms. Cotton proactively cooperated with the investigation and for over four- and one-half years sought updates through emails and phones calls.

73.   That on September 9, 2021, Ms. Cotton received a letter from OCR with the disposition of her complaints. (See Exhibit 2)

74.   That once Ms. Cotton reviewed the letter she uncovered the true nature of her race discrimination claims centered around Adrian's failure to follow its own athletic disciplinary policy as well the Student Code of Conduct policy.

75.   Furthermore, the OCR investigator uncovered that Adrian and Coach Morris did not follow Title VI.

76.   As a result, OCR informed Ms. Cotton that "before OCR completed its investigation,  the college expressed an interest in resolving the complaints pursuant to Section 302 of OCR's Case Processing Manual".

77.   OCR also indicated that "[T]he college has submitted an agreement to resolve the allegations in the complaint." At which time, OCR decided that they could  close its investigation.

78.   That in the resolution agreement, Adrian would among other things, provide training on Title VI to the coaches of the women basketball team and College administrators in charge of overseeing athletics.

79.   That additionally the resolution agreement required that Adrian issue a letter to Ms. Cotton letting her know that the college did not follow its internal policies in wrongfully removing her from the women's basketball team (See Exhibit 3).

80.   Over five years later, that this was a hollow victory for Ms. Cotton as she lost her final year of eligibility,  missed an opportunity to competing that summer with a national basketball team, and derailed her ability to compete at the professional level and ultimate goal of coaching.

81.   That Adrian and President and Board of Trustees have a practice of condoning discriminatory practices. For an example, in 2011, the College reached an agreement with the federal Department of Education's Office of Civil Rights, resolving complaints that the College had violated Title IX. Adrian College was found guilty of eleven violations of the law that governed gender equality and agreed to make several changes to its athletic programs.

## COUNTS

### COUNT I:
### DEFENDANTS VIOLATED VI OF THE CIVIL RIGHTS OF 1964
### DISCRIMINATION BASED ON RACE

82.   Ms. Cotton realleges and incorporate by reference the allegations contained in the previous paragraphs as if fully set forth herein.

83.   At all relevant times, the Defendants were acting within the scope of their employment and/or the direction and under the control of Adrian and Board of Trustees,  Moreover, at all relevant times appropriate agents were made aware of and took no action against the conduct of Coach Morris, thereby ratifying the conduct and rendering Adrian and Board of Trustees vicariously liable for the conduct of their agents via the doctrine of Respondent Superior.

84.   Coach Morris violated Title VI of the Civil Rights Act of 1964 by subjecting Ms. Cotton to a series of intentional hostile acts and adverse actions designed to deny her athletic pursuits because of her race.

85.   Title VI provides: "No person in the Unites States shall, on the grounds of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §§2000d.

86.   Ms. Cotton is a Black woman, who was discriminated against because of her race. Accordingly, she is a member of a protected class.

87.   Adrian received federal financial assistance and is therefore subject to the provisions of Title VI of the Civil Rights Act of 1964.

88.   As detailed herein, as a direct result of Adrian and Board of Trustees acts or omission, Ms. Cotton was intentionally made to endure hostile and harassing treatment by Coach Morris in an effort to continue her athletic pursuits,

including but not limited to:  Removal from the women's basketball program without cause, discrimination and disparate treatment, deliberate indifference by Defendants Adrian and Board of Trustees and/or failure to investigate Ms. Cotton's removal, lack of response to Ms. Cotton's request to challenge the Notice of No-Contact, failure to follow its own internal student and athletic policies, deliberate indifference and/or inadequate investigation and response to Ms. Cotton request to rescind Notice of No-Contact after the frivolous civil case was dismissed, retaliation and racially hostile treatment at Adrian as detailed due to Ms. Cotton's filing her original complaint with OCR, and Adrian lack of appropriate policies and procedure to remedy the same.

89.   Additionally, Adrian and its Board of Trustees had actual knowledge of the discrimination faced by Ms. Cotton because of race and resulting harm created by Adrian's failure to investigate and discipline Coach Morris promptly consistent with federal and state law.

90.   Adrian failure to promptly and appropriately respond to the discrimination reported by Ms. Cotton resulted in her exclusion from participating in, and denial of the benefits, and further discrimination in Adrian women's basketball program, in violation of Title VI.

91.   Adrian engaged in a pattern and practice of behavior designed to discourage and dissuade students who have knowledge of discriminatory practice from reporting it to Adrian.

92.   This policy and/or practice constituted disparate treatment and impact of racial minorities; specifically Black student athletes like Ms. Cotton.

93.   Ms. Cotton has suffered and continue to suffer emotional distress and psychological damage as well as physiological harm as a direct and proximate result of Adrian conduct, including the facts detailed herein, and namely Adrian's deliberate indifference of her rights under Title VI.

94.   That later according to the OCR investigator, Adrian and Coach Morris attempted to use the frivolous Notice of No-Contact and PPO to support their ultimate justification for removing Ms. Cotton from the team.

95.   That the due process clause of the 14th Amendment provides that the state may not deprive a person of life, liberty, or property without due process of law.

96.   Defendants deliberately exposed Ms. Cotton to Coach Morris, knowing that she could and would cause serious emotional damage by discriminating against Black women student athletes like Ms. Cotton on campus.

97.   This conduct was culpable in the extreme.

98.  Ms. Cotton was a foreseeable victim of Adrian's decision to make Coach Morris the women's head coach.

99.  The impact of Ms. Cotton's removal without rationale or in compliance with any policy or procedure was foreseeable and direct.

100. The decisions and actions to deprive Ms. Cotton of any future opportunity to play or coach at the professional level.

101. Defendants acted in willful disregard for Ms. Cotton's rights as a student athlete.

102.  Adrian and Trustees had a fiduciary duty to protect students, like Ms. Cotton from harm; and Defendants breached that duty by allowing Ms. Cotton's removal to go unaddressed.

103.  At all relevant times, Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

104.   That a non-exhaustive list of Defendants' wrongful actions which deprived Ms. Cotton of her fundamental right to a fair process based and on race and later retaliation in violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C §§ 2000d through 2000d-6, Fourteenth Amendment procedural due process, discrimination in violation of 42 U.S.C. § 1981, and state law claims:

105.   Defendants accepted as fact uncorroborated statements and overlooked potentially exculpatory evidence;

106.   Defendants retaliated against Ms. Cotton after she filed a complaint with the U.S. Department of Education Office of Civil Rights (OCR) OCR Docket #15-17-2071, related to her dismissal from the women's basketball team.

107.   Under Title VI, the Defendants Adrian and its Board of Trustees are responsible for Ms. Cotton's damages stemming from Coach Morris discriminatory practices and by complicitly placing vulnerable student athletes like Ms. Cotton under Coach Morris' control.

108.   Under Title VI, Coach Morris in her official and individual capacity is responsible for Ms. Cotton's damages stemming from her intentional and total disregard of Adrian College nondiscriminatory policy.

109.   That the Defendants condoned Coach Morris attempt to mislead the investigator(s) from OCR tasked with reviewing the removal of Ms. Cotton as well as the conduct of Coach Morris. These complicit acts were done through a calculated campaign of artifice and continued misrepresentations, with both affirmative and omissive acts and misstatements amounting to fraudulent concealment.

110.   As a result of Defendants' discriminatory and unlawful conduct, this civil action against Defendants is for declaratory, injunctive, equitable, and monetary relief for injuries sustained by Ms. Cotton.

111. Title VI may be violated by a school's failure to prevent or remedy racial discrimination or retaliation for filing an OCR complaint. In either case, the statue is enforceable through an implied private right of action.

112. The "prompt and equitable" procedure that a school must implement to "accord due process to both parties involved" must include, at a minimum: • "Notice…of the procedure, including where complaints may be filed"; • "Application of the procedure to complaints alleging racial discrimination…"; • "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; • "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and • "Notice to the parties of the outcome of the complaint…"5

113. Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title VI.

114.   This unlawful discrimination in violation of Title VI proximately caused Ms. Cotton to sustain substantial injury, damage, and

loss, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

115.   As a result, Ms. Cotton is entitled to damages in an amount to be decided at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursement.

116.   A person has a protected liberty interest in her good name, reputation, honor, and integrity, of which she cannot be deprived without due process.

117.   A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

118.   Ms. Cotton's constitutionally protected property interest in her continued involvement on the women's basketball program  at Defendant Adrian and to be free from arbitrary removal arises from the policies, courses of conduct, practices and understandings established by Adrian.

119. Ms. Cotton's constitutionally protected property interest further arises from the express and implied contractual relationship between Adrian and Ms. Cotton.

120.  It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings. A person

who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing her education at that university until she has completed her course of study. Adrian cannot deprive a person of this interest without due process.

121.  As a result, if Ms. Cotton as an Adrian student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged harassment of Ms. Crawford, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution would apply to the disciplinary process that Adrian used. Here the issue is worse, as Adrian never applied any disciplinary process at all.

122.  Under both federal and state law, Ms. Cotton had a constitutionally protected property interest in continuing her student athlete career at Adrian.

COUNT II:
DEFENDANTS VIOLATED VI OF THE CIVIL RIGHTS OF 1964
BASED ON RETALIATION AND HOSTILE ENVIRONMENT

123.  Ms. Cotton realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

124.  The anti-retaliation provision of Title VI provides that, "No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or

privilege secured by Section 601of the [Civil Rights] Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing, under this part." 34 C.F.R. § 100.7(e).  As a result, Ms. Cotton was protected and a right to be free from the retaliation and hostile environment after filing her original discrimination complaint with the U.S. Department of Education Office of Civil Rights. At all relevant times, Defendants Adrian and Board of Trustees, and Coach Morris were acting in their official capacities.

125.   The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in Defendants' positions should have known.

126.    As a matter of custom, policy, and/or practice, Defendants had and have the ultimate responsibility and authority to investigate complaints against their employees, agents, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

127.    Defendants had a duty to prohibit discriminatory acts based on race on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title VI.

128.  Defendants' failure to address Ms. Cotton's complaints led to an unknown number of school and state violations.

129.  Additionally, Defendants' failure to properly address the inquiry of Ms. Cotton removal, Notice of No-Contact, first and second OCR complaints led to the Defendants condoning the acts of Coach Morris. Indeed, all that Adrian and Board of Trustee needed to do was investigate or follow its disciplinary procedures against Ms. Cotton. It is apparent they refused to do so because they would have uncovered that it was Coach Morris and Ms. Crawford in violation of school and student-athlete policies and not Ms. Cotton.

130.  Ultimately, Defendants failed to investigate the complaints of racial discrimination which clearly violated Ms. Cotton's established constitutionally protected rights, by failing to:  a. Perform any investigation into Coach Morris' conduct after receiving multiple complaints; and b. Thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the Coach Morris actions. By failing to prevent the aforementioned discrimination based on race and subsequent retaliation upon Ms. Cotton, and by failing to appropriately respond to reports of Coach Morris' discrimination in a manner that was so clearly unreasonable it amounted to deliberate indifference.

131.   Defendants are also liable to Plaintiff under Civil Rights Act of 1964 for maintaining customs, policies, and practices which deprived Ms. Cotton of rights secured by the Fourteenth Amendment to the United States Constitution.

132.   Defendants tolerated, authorized and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, or discipline Coach Morris, with the result that Coach Morris was allowed to violate the rights of persons such as Ms. Cotton with impunity.

COUNT III:
DEFENDANTS VIOLATED VI OF THE CIVIL RIGHTS OF 1964
FAILURE TO SUPERVISE

133.  Ms. Cotton realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

134.  Defendants have the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Coach Morris, assistant coaches, and staff regarding their duties toward student athletes.

135.  Defendants failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

a. Perceive, report, and stop discrimination on race  on campus;

b. Provide diligent supervision over student athletes and other individuals, including Coach Morris;

29

c. Report suspected incidents of removal from the women's basketball program;

d. Thoroughly investigate any complaint of retaliation or other misconduct against Coach Morris;

e. Provide a safe environment for all students, faculty, staff, and visitors to Adrian's premises free of racial discrimination and harassment; and,

f. Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment.

g. The above list of duties is not exhaustive.

136.    Defendants failed to adequately train coaches student athletes, administrators and others regarding the aforementioned duties which led to violation of Ms. Cotton's rights.

137.    Defendants' failure to adequately train was the result of Defendants' deliberate indifference toward the well-being of student athletes.

138.    Defendants' failure to adequately train is closely related to or actually caused Ms. Cotton's injuries.

139. As a result, Defendants deprived Ms. Cotton of rights secured by the Fourteenth Amendment to the United States Constitution in violation and Title VI.

<u>COUNT IV:</u>
<u>FRAUDULENT CONCEALMENT</u>

140. Ms. Cotton realleges and incorporates by reference the allegations contained in the previous and subsequent paragraphs.

141. Ms. Cotton's claims are subject to equitable tolling on fraudulent concealment grounds. State law governs equitable tolling, including for federal claims. See Tomanio, 446 U.S. at 485; Johnson, 777 F.3d at 845. With respect to fraudulent-concealment tolling, Michigan law provides: If a person who is or may be liable for any claim fraudulently conceals the existence of the claim . . . from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim . . . although the action would otherwise be barred by the period of limitations. Mich. Comp. Laws § 600.5855 (emphases added).

142. As a result of the below mentioned acts, M.C.L. § 600.5855 is applicable.

143. Both Coach Morris and Defendants, through their employees, agents, and representatives, including but not limited to school administrators and women basketball athletic assistant coaches, fraudulently concealed the existence of Ms. Cotton's claims, both before and after her initial inquiry to Adrian and OCR complaint, by, among other things, (1) concealing from Ms. Cotton that Coach

Morris did not follow their internal athlete disciplinary policy when she removed Ms. Cotton, making it discriminatory on its face, (2) concealing from Ms. Cotton that Adrian and its employees, agents, and representatives were aware when they issued the Notice of No-Contact it was done in violating of Ms. Cotton's due process rights outlined in the Adrian Student Code of Conduct policy and did nothing to stop it. That it was apparent that the Defendants overall objective during the investigation was to distort and/or shield the truth from the OCR investigator.

144.    That Coach Morris intentionally misrepresentation and attempted to mislead the OCR investigator in the following ways according to the OCR investigator letter to Adrian, specifically Mr. Hiribar, dated September 9, 2021 (See Exhibit 4: Letter to Adrian):

a.  Coach Morris supplied the OCR investigator a letter signed by the coaches indicating the reason for Ms. Cotton's dismissal. However, the OCR investigator uncovered that the letter was undated and created after the coaches made their decision to dismiss Ms. Cotton. This was a clear attempt to mislead the investigator on her culpability for wrongfully removing Ms. Cotton from the team, which in turn was an attempt to delay the uncovering of a claim to this case (Page 2 of Letter to Adrian).

b. Later in the investigation, Coach Morris intentionally tried to mislead the OCR investigator by informing him that Ms. Cotton's dismissal was due to mistreatment of teammates. However, when asked for specific details, Coach Morris was evasive and did not clearly articulate the details of such mistreatment. Even when the investigator's letter was given to Ms. Cotton specific details surrounding her dismissal were not specified. (Page 3 of Letter to Adrian). This was a clear attempt to mislead the investigator on her culpability for wrongfully removing Ms. Cotton from the team, which in turn was an attempt to delay the uncovering of a claim to this case.

c.  That the coaches deceptively informed the OCR investigator that Ms. Cotton's behavior violated team policy and warranted dismissal from the team. However, according to the September 9, 2021, OCR investigative report, when asked which team policy was violated none of the coaches could recall what Ms. Cotton actually did to warrant dismissal. This was a clear attempt by the coaches to mislead the investigator on Coach Morris' culpability for wrongfully removing Ms. Cotton from the team, which in turn was an attempt to delay the uncovering of a claim to this case. (Page 3 of  Letter to Adrian)

d.  Coach Morris supplied the OCR investigator a document of a progressive discipline process that was signed by all the players. This was a clear attempt by Coach Morris to give the OCR investigator the impression that she

applied the appropriate disciplinary action in Ms. Cotton's case. However, when the OCR investigator probed further to figure out if the policy was applied to Ms. Cotton, Coach Morris responded that she did not recall (Page 3 of Report). This was a clear attempt by Coach Morris to mislead the investigator on her culpability for wrongfully removing Ms. Cotton from the team, which in turn was an attempt to delay the uncovering of a claim to this case.

      e.  Coach Morris informed the investigator that she has dismissed other students from the basketball team in the past, but when pressed for details she could not recall how often that had happened, when she last dismissed another student from the team, or the race of any of the other previously dismissed students (Page 4 of Report). This was a clear attempt by Coach Morris to mislead the investigator on her culpability for wrongfully removing Ms. Cotton from the team, which in turn was an attempt to delay the uncovering of a claim to this case (Page 3 of Report).

      f.  In an attempt to delay the investigation related to Ms. Cotton's retaliation complaint, Adrian tried to inundate the OCR investigator with documents unrelated to the complaint. For an example, the college sent the OCR investigator a college police report related to Ms. Cotton  from December 2015 but intentionally did not explain its  relevancy to Ms. Cotton's dismissal from the team or her complaint. (See page 4 of Letter to Adrian) This was a clear attempt by

Adrian to mislead the OCR investigator and conceal Coach Morris' wrongful

removal of Ms. Cotton from the team, which in turn was an attempt to delay the

uncovering of a claim to this case

 (Page 5 of Report).

`     145. These affirmative and acts of concealment only became known to Ms.

Cotton after the OCR September 9, 2021, letter to Ms. Cotton and subsequently a

letter dated the same day to Adrian.

   146.  On October 25, 2021, Adrian sent Ms. Cotton a letter admitting their

violations. (see Exhibit 5)

   147.  Prior the above referenced communications, Ms. Cotton had no way

of knowing the bases for those claims until she received the OCR letter and

Adrian's subsequent admission.

    148.  Thus, the Defendants acts were intended to conceal the claim; Adrian

and Coach Morris knew those actions were false and/or misleading; that they

intended that the investigator to rely upon the  representation or actions. The

actions above were taken by the Defendant after Ms. Cotton filed her OCR

complaints and as a result Ms. Cotton sustained damages associated with the

misrepresentations in the form of prolonging the time OCR had to wait to complete

its investigation in an effort to derail Ms. Cotton ability to file her lawsuit.

149.  The Adrian's delayed the investigation for over four- and one-half years and then admit fault afterwards in an effort to hide reasonable claims from Ms. Cotton until they believed it will be too late to sue; it's only fair that Ms. Cotton get more time to bring her claim in accordance with  MCL 600.5855 when the OCR investigation was released to her on September 9, 2021, which makes this lawsuit timely.

150.   Ms. Cotton request a Jury Trial

WHEREFORE, Ms. Cotton requests trial by jury of all issues triable as of right, and that  this court enter judgment against Defendants in lost wages and benefits (past and future), humiliation, embarrassment, and emotional distress, in whatever amount she is found to be entitled; compensatory damages in whatever amount she is found to be entitled; punitive and exemplary damages commensurate with the wrong and Defendants ability to pay; an award of interest, cost and reasonable attorney fees, and whatever other equitable relief appears appropriate at the time of trial.

Respectfully submitted,


Dated:  2/17/2022                    */S/Rodney Williams*
                                     Rodney Williams P47888
                                     Attorney for Plaintiff
                                     615 Griswold Street: Suite 700
                                     Detroit, Michigan 48226
                                     (313) 309-7852

(313) 309-7853
AttorneyRodneyWilliams@gmail.com

Certification of Service: I certify that on February 17, 2022, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system, which will provide electronic copies to counsels of record who are ECF participants.


*/s/Rodney Williams*
RODNEY WILLIAMS
Attorney for Plaintiff